UNION TELEPHONE COMPANY,
INC., Petitioner,

v.

The WYOMING PUBLIC SERVICE
COMMISSION; John R. Smyth, Bil
Tucker, and Nels J. Smith, in their offi-
cial capacities as Commissioners of the
Wyoming Public Service Commission;
and AT & T Communications of the
Mountain States, Inc., Respondents.

No. 90–189.

Supreme Court of Wyoming.

Nov. 21, 1991.

Bruce S. Asay, Cheyenne, V. Anthony Vehar, Vehar, Beppler, Lavery, Rose & Boal, P.C., Evanston, and James J. Cassity and Merrill F. Nelson, Kirton, McConkie & Poelman, Salt Lake City, Utah, for petitioner.

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, Sr. Asst. Atty. Gen., Milo Vukelich, Asst. Atty. Gen., for respondent Wyoming Public Service Com'n.

Thomas A. Nicholas, III, Hirst & Applegate, P.C., Cheyenne, and William P. Eigles, Denver, Colo., for respondent AT & T Communications of the Mountain States, Inc.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

THOMAS, Justice.

The issue that the court must address in this case is the lawfulness of an adjudicated decision by the Public Service Commission (PSC) assigning the authority to provide long distance telephone service for intrastate interLATA (Local Access and Transport Area) calls. The decision of the PSC is challenged under the requirement

that, in order to be lawful, its decision must not be arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law and must be supported by substantial evidence. The case turns upon whether Union Telephone Company, Inc. (Union), an intrastate purveyor of telephone service, had authority under its certificate of public convenience and necessity to provide intrastate interLATA service to its customers or whether AT & T Communications of The Mountain States, Inc. (AT & T) was the entity certified by the PSC to furnish this long distance service. The PSC ruled that Union did not have that authority pursuant to its certificate and decided that the authority to furnish such services was assigned to AT & T pursuant to the latter's certificate of public convenience and necessity. Our review of the entire record satisfies us that the evidence establishes that the authority for this particular long distance telephone service was assigned to AT & T and that the decision of the PSC continues the historic arrangement for such telephone service. The record fails to disclose that any events had occurred that would justify a change in the allocation of that authority by the PSC, and its determination of the case should be affirmed. A collateral issue is presented that attacks the provisions of the PSC's order implementing its decision. We hold that the order of the PSC with respect to implementation was not arbitrary, capricious, or unlawful and that it was supported by substantial evidence. The order of the PSC is affirmed.

Union, in its Appellant's Brief, states the issues to be:

"1. Whether the Commission's finding and conclusion that Union Telephone Company, Inc. ('Union') lacks authority to provide certain long distance telephone service (known as 'intrastate interLATA service') to its own customers, despite the fact that it has done so for many years, is arbitrary and capricious, unlawful, or unsupported by substantial evidence.

"2. Whether the Commission's finding and conclusion that AT & T has authority to provide the disputed long distance telephone service to Union's customers is arbitrary and capricious, unlawful, or unsupported by substantial evidence.

"3. Whether the Commission's findings and conclusions regarding implementation of its decision are arbitrary and capricious, unlawful, or unsupported by substantial evidence."

The PSC, in its brief as respondent or appellee, rephrases the issues in this way:

"I. Was the Public Service Commission of Wyoming arbitrary, capricious or did it abuse its discretion when it made the following findings and conclusions,

"1. That Union Telephone Company, Inc. lacked the authority to provide intrastate interLATA telephone service;

"2. That AT & T Communications of the Mountain States, Inc. had the authority to provide intrastate interLATA telephone service to customers within Union's service area; and

"3. Regarding implementation of the Commission's decisions.

"II. Were such findings and conclusions unlawful or unsupported by substantial evidence?"

In its Brief of Respondent–Appellee AT & T Communications of the Mountain States, Inc., AT & T urges that only the first issue articulated by Union is of significance in this case on the ground that its complaint which initiated the case and the decision of the PSC were not premised on either of the other issues. In our judgment, Union's second issue is inextricably intertwined with the first issue because AT & T would have no basis for its complaint in the absence of authority to provide the disputed service. Furthermore, the order on rehearing by the PSC addressed with particularity the implementation of its decision, and Union's third issue is significant in the case.

This appeal arises from a complaint brought by AT & T before the PSC in which AT & T asserted that Union was involved in providing services that had been assigned to AT & T by its certificate of public convenience and necessity. The

issues are rather standard administrative review issues, but they do arise in a somewhat novel setting. The setting is complicated by the nature of the development of telephone services in the state of Wyoming, and that complication has been exacerbated by the efforts of the federal judiciary to manage the telephone communications industry in the United States.

Union is an independent telephone company that was organized in 1914 to provide telephone service for portions of Sweetwater and Uinta Counties in Wyoming and for portions of Daggett and Summit Counties in Utah. It is an example of other independent telephone companies in Wyoming that serve customers in another state as well as in Wyoming. Union did have a certificate of public convenience and necessity authorizing it to furnish telephone service in Wyoming.

The problem presented in this case is a consequence of the largest antitrust suit in American history, the civil action filed by the United States in 1974 against American Telephone and Telegraph and Western Electric Company. On August 24, 1982, the federal district court for the District of Columbia approved a landmark agreement between the parties to that action that broke up what was recognized as the "Bell System." *See* "Modification of Foreign Judgment" (hereinafter MFJ), *United States v. American Telephone & Telegraph Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The MFJ divested American Telephone and Telegraph Company of the Bell Operating Companies (BOCs), which were wholly owned subsidiaries that had been engaged in providing regional telephone service. *American Telephone & Telegraph Co.*, 552 F.Supp. at 139, n. 19. The federal court described the result in this way:

"Section I of the proposed decree would provide for significant structural changes in AT & T. In essence, it would remove from the Bell System the function of supplying local telephone service by requiring AT & T to divest itself of the portions of its twenty-two Operating Companies which perform that function. "The geographic area for which these Operating Companies would provide local telephone service is defined in the proposed decree by a new unit, the 'exchange area.' According to the Justice Department, an exchange area 'will be large enough to comprehend contiguous areas having common social and economic characteristics but not so large as to defeat the intent of the decree to separate the provision of intercity services from the provision of local exchange service.' Court approval would be required for the inclusion in an exchange area of more than one standard metropolitan area or the territory of more than one State." *American Telephone & Telegraph Co.*, 552 F.Supp. at 141 (footnote omitted).

In a subsequent order, the federal court approved the division of all former Bell territory in the United States into geographically-limited exchange areas called Local Access and Transport Areas (LATAs).[1] *United States v. Western Electric Co.*, 569 F.Supp. 990 (D.D.C.1983), *appeal dismissed* 714 F.2d 178 (D.C.Cir.1983). By the provisions of this latter order, the BOC servicing a LATA was permitted to carry only intraLATA telephone calls. *Western*

---

1. "LATAs" and "exchange areas" are essentially equivalent terms for the same geographic divisions. The *Western Electric* court explained the evolution of the LATA concept as follows:
   " * * * Unfortunately, as drafted by the parties, the [MFJ] speaks of the areas in which the Operating Companies will provide post-divestiture services as 'exchange areas.' Since traditionally regulators have used the term 'exchange area' in an entirely different sense, this terminology in the decree has led to a considerable amount of confusion. * * *

The confusion occasioned by the dual usage of the term 'exchange' prompted AT & T to suggest * * * that the phrase 'local access and transport area,' with the acronym LATA, be employed when referring to the exchange area that is the creation of this antitrust decree * * *. The Court * * * [has] adopted this terminology, and it will consistently be used herein." *United States v. Western Electric Company, Inc.*, 569 F.Supp. 990, 993 n. 9 (D.D.C.1983).

*Electric,* 569 F.Supp. at 994. The BOCs could not handle any calls that were placed from one LATA to another LATA, even if both of those LATAs were serviced by the same BOC. *Western Electric,* 569 F.Supp. at 994, n. 14. The interLATA communications were to be carried by AT & T or one of its competitors, after having been picked up from the LATA servicer. *Western Electric,* 569 F.Supp. at 994.

Pursuant to the federal decree, the former Bell territory within Wyoming was amalgamated as essentially one LATA, and it was serviced by Mountain States Telephone and Telegraph Company (Mountain Bell). Within the boundaries of Wyoming, however, there were eighteen small LATA variances that reflected existing service conditions and certificated authority granted to companies other than Mountain Bell by the PSC at the time the Wyoming LATA was instituted. As a product of these variances, mostly around the borders of the state, not all telephone calls from one location in Wyoming to another are intraLATA calls.[2] Calls initiated in one LATA in Wyoming, but terminating in another LATA within Wyoming, are known as "intrastate interLATA service."

Prior to the effective date of the federal divestiture order, January 1, 1984, Union provided long-distance service for Union's customers within the state of Wyoming by connecting with Mountain Bell. These interconnected calls were handled pursuant to a toll settlement agreement between Union and Mountain Bell. That arrangement provided that Mountain Bell would pick up calls from Union's customers for any destination in Wyoming, and it would then hand them off to other telephone companies that were to become other LATAs within the state. After January 1, 1984, Mountain Bell no longer could provide the long-distance service between LATAs in Wyoming. A new system was required by the MFJ in order to furnish intrastate interLATA service.

To accommodate to that new system, the PSC, on December 28, 1983, had granted AT & T Communications of the Mountain States, Inc., a subdivision of AT & T Communications, Inc., an interim certificate of public convenience and necessity that authorized AT & T:

"* * * .[T]o provide intrastate inter LATA telephone and telecommunication service throughout the State of Wyoming effective January 1, 1984."

This certificate of public convenience and necessity also provided:

"Such interim certificate authority granted is to be restricted to that intrastate inter LATA telephone and telecommunication service currently provided by Mountain States Telephone and Telegraph Company [Mountain Bell] in the State of Wyoming, which Mountain States Telephone and Telegraph Company will be precluded from providing after January 1, 1984, pursuant to [the MFJ]."

Later, the interim authority granted on December 28, 1983 was made permanent by the PSC.

Beginning upon the effective date of the divestiture in January, 1984 and continuing until February, 1986, Union and AT & T cooperated to provide intrastate interLATA service for Union's customers under an arrangement which provided that AT & T would furnish to customers within Union's territory operator-handled and direct-dialed message toll service for the intrastate interLATA calls. Union recorded the call particulars, and it billed its customers and collected revenues from them for those calls. Union remitted the revenues for the service to AT & T by purchasing the accounts receivable generated by AT & T for the calls. The revenues were accounted for by the use of a purchase of accounts receivable statement (PARS) that was initi-

---

**2.** An example of that situation would be a call from Mountain View to Torrington. That call would be initiated in Union's territory; it then would be "handed off" to Mountain Bell at Kemmerer Hill; it would be carried by Mountain Bell to Cheyenne; at Cheyenne, AT & T would pick up the call and it would be transported by AT & T to Denver, Colorado. From Denver, Colorado, the call would be transported to Scottsbluff, Nebraska, at which point it would be picked up and terminated by Scottsbluff United Telephone Company in Torrington, a part of an entirely different LATA. See the map attached as Appendix 1.

ated and furnished by Union. In order to facilitate access to Union's customers by AT & T, Union provided to AT & T, and charged for, Feature Group C originating and terminating access[3] to Union's local exchange network. This access did not result in AT & T's facilities being directly connected to Union's facilities. Instead, an intrastate interLATA call placed by an AT & T customer in Union's territory first was routed to Union's connection with Mountain Bell, and Mountain Bell then turned the call over to AT & T.

In February, 1986, Union initiated a change. Union decided that it was authorized to provide intrastate interLATA service to its own customers without following the arrangement previously pursued with AT & T. At that time, Union began providing operator-handled intrastate interLATA message toll services to those AT & T customers who were in Union's territory. Customers attempting an operator-assisted intrastate interLATA call were connected directly to a Union operator rather than an AT & T operator. The calls still were routed through AT & T's lines. At that time, Union also discontinued the reporting and remitting of operator surcharges to AT & T for completion of those calls.

Then, in September of 1986, Union expanded this service so that it included direct-dial intrastate interLATA message toll service to AT & T customers in its territory. At that point in time, Union began withholding all toll revenues from AT & T for intrastate interLATA calls. Union stopped furnishing the PARS for interLATA toll revenues to AT & T, and it stopped billing the AT & T originating and terminating access charges.

Next, on January 1, 1988, Union implemented an originating responsibility plan (ORP). This plan was approved by the PSC, and Union interpreted the ORP as assigning to Union primary responsibility for all toll service originating within Union's service area. Under the ORP, Union developed toll rates and access charges for servicing calls from its territory; it billed and retained the revenues for toll calls, paying other carriers for their services. Under Union's plan, AT & T and other interexchange[4] carriers were allowed access to Union's network using Feature Groups A and B access until such time as Feature Group D access could be implemented. Under this arrangement, Union would have remained the primary intrastate interLATA servicer because of its control of Feature Group C access.

In the meantime, on October 9, 1987, AT & T filed a complaint with the PSC in which it requested that the PSC order Union to stop providing direct-dialed and operator-handled intrastate interLATA message telecommunication service within the state of Wyoming. The complaint further requested that Union be ordered to remit to AT & T all monies received by Union for intrastate interLATA communications subsequent to September, 1986 and that Union should be required to compensate AT & T for the use of AT & T's network and switching facilities. Union answered the complaint and instituted a counterclaim for access charges that it claimed were owed to it by AT & T.

3. Feature Group Services refer to the connections which allow local telephone users to access long distance facilities of the caller's choice. Feature Groups A and B allow the user to be connected with a line or trunk in order to access the long distance service. With either Feature Group A or B, the customer dials an access code to reach the long-distance service. Feature Group C allows a customer to access the long-distance service directly through 0 + or 1 + dialing. Mountain Bell provides Feature Group C access to AT & T in its service area and thus customers may automatically reach AT & T by 0 + or 1 + dialing. Feature Group D, the most advanced service available at the present time, allows a user to reach any available long distance carrier simply by 0 + or 1 + dialing.

   *Originating* access refers to the access needed to process outgoing calls. *Terminating* access refers to the access needed to carry incoming calls into the area served by the local telephone company.

4. Again, as the *Western Electric* court explained: "'Interexchange' as defined in section IV(K) of the decree is identical to what has generally herein been referred to as inter-LATA; and 'intraexchange' is identical to 'intra-LATA.'" *United States v. Western Electric Company, Inc.,* 569 F.Supp. 990, 1008 n. 84 (D.D.C.1983).

After extensive hearings, including the submission of voluminous exhibits,[5] the PSC issued an order on December 19, 1988. In that order, the PSC found that Union was not authorized to provide intrastate interLATA service. It further found that the authority to furnish such service was assigned to AT & T. Consistently, the PSC ordered Union to cease and desist providing intrastate interLATA service to its customers; it suspended Union's ORP[6] for such service; and it ordered Union to provide AT & T with Feature Group C access so that AT & T could provide the intrastate interLATA service in lieu of Union. Union also was ordered to bill for and collect AT & T's intrastate interLATA charges and to report its toll revenue for those charges on a PARS. The PSC further determined that Union owed AT & T the sum of $2,800 in satisfaction of the withholding of payments and of all monetary claims and counterclaims in the proceeding.

After the commission's order was filed, Union and AT & T both requested a rehearing, and Union applied for permission to supplement the record. On March 30, 1989, the PSC entered its notice and order granting the petitions for rehearing of both parties, and the PSC also permitted the parties to submit additional and supplemental evidence and argument at the rehearing. There followed further hearings at which both parties produced witnesses and exhibits, and the commission then issued its Order on Rehearing on October 23, 1989. This order affirmed the previous order of the commission, with certain modifications. Union was required to file an access services tariff with the PSC for Feature Group C access rates, and it also was required to hand off all intrastate interLATA calls to AT & T's operators and to remit to AT & T the revenues for such calls including the operator surcharge.

Union filed a petition for judicial review of the Order on Rehearing by the district court. After the case was docketed in the district court, it was certified directly to this court pursuant to Rule 12.09, W.R.A.P.

When a case is certified to this court pursuant to Rule 12.09, W.R.A.P., we examine the decision of the administrative agency as if we were the reviewing court of the first instance. *Vandehei Developers v. Public Service Commission*, 790 P.2d 1282 (Wyo.1990); *Exxon Corporation v. Wyoming State Board of Equalization*, 783 P.2d 685 (Wyo.1989); *cert. denied* —— U.S. ——, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). The authority vested in a reviewing court is set forth in § 16-3-114(c)(ii), W.S.1977 (July 1990 Repl.), as follows:

"(ii) [The reviewing court may] [h]old unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

■ Union challenges the decision of the PSC on the ground that it was arbitrary, capricious, and not in accordance with law. In reaching a determination with respect to whether the factual decision of an administrative agency is arbitrary and capricious, our standard is that we review the entire record and determine whether the decision can be supported by evidence found in that record. *Palmer v. Board of Trustees of Crook County School District No. 1*, 785 P.2d 1160 (Wyo.1990). In *Vandehei*, which is a case that also involved the PSC, we

---

5. The administrative record in this case is comprised of nearly 3,000 pages.

6. Although the Commission had previously approved Union's ORP, it does not appear that this approval constituted an endorsement of Union's subsequent practices concerning intrastate

interLATA service. In any case, the order approving the ORP specifically stated that "[t]his order does not affect the formal complaint filed by AT & T against Union in Docket No. 9768 [the present controversy]."

further articulated our standard of review in this way:

"* * * Petitioners have the burden of proving that the PSC's actions were arbitrary, capricious or an abuse of discretion. *Wyoming Bancorporation v. Bonham,* 527 P.2d 432, 439 (Wyo.1974), *op. supp.,* 563 P.2d 1382 (Wyo.1977), *reh'g denied,* 566 P.2d 219 (Wyo.1977). The reviewing court must examine whether the decision made by an administrative agency has been reached on relevant factors and was rational. *Tri–State Generation and Transmission Association, Inc. v. Environmental Quality Council,* 590 P.2d 1324, 1331 (Wyo.1979). Agency decisions are to be reversed only for errors of law. *Shenefield v. Sheridan County School District No. 1,* 544 P.2d 870, 874 (Wyo.1976). Further, courts will not substitute their judgment for that of an administrative agency. *Gilmore v. Oil and Gas Conservation Commission,* 642 P.2d 773 (Wyo.1982)." *Vandehei,* 790 P.2d at 1284.

In this statement of the standard, the concept of an error of law is included.

■ Union also challenges the decision of the PSC on the ground that it is not supported by substantial evidence. In reaching the determination as to whether the record encompasses substantial evidence to support the agency decision, we also review the entire record presented before the agency. *Matter of Warehime,* 806 P.2d 292 (Wyo.1991); *Tri–State Generation and Transmission Association, Inc. v. Wyoming Public Service Commission,* 784 P.2d 627 (Wyo.1989); *Western Radio Communications, Inc. v. Two–Way Radio Service,* 718 P.2d 15 (Wyo.1986). In this court, the burden of establishing the absence of substantial evidence is assigned to the party challenging the sufficiency of the evidence. *Palmer; Western Radio.* Substantial evidence is relevant evidence, which reasonable minds would accept as adequate to support the findings of the agency. *Palmer; McCulloch Gas Transmission Company v. Public Service Commission of Wyoming,* 627 P.2d 173 (Wyo. 1981). The administrative agency is vested with the authority to weigh and determine the credibility of evidence based upon its expertise and experience. *Palmer; Western Radio; Matter of Rule Radiophone Service, Inc.,* 621 P.2d 241 (Wyo.1980). We do not substitute our judgment for that of the PSC if the agency decision is supported by substantial evidence. *Mountain States Telephone and Telegraph Company v. Public Service Commission of Wyoming,* 698 P.2d 627 (Wyo.1985). Sections 37–2–112, –2–118, and –2–127 (Dec. 1977 Repl.), extend jurisdiction to the PSC to hear this controversy.

The review of the record that we have accomplished persuades us that the findings and conclusions of the PSC were neither arbitrary nor capricious; we found no abuse of discretion; and the decision is not unlawful. Furthermore, the record encompasses ample substantial evidence to support the orders that the PSC entered.

Examining the issues asserted by Union, we turn first to its claim that the decision of the PSC, that Union could not properly furnish intrastate interLATA service to its customers, is erroneous. Union challenges that aspect of the order on several grounds. First, Union relies upon the following language in its 1957 certificate of public convenience and necessity, which Union claims gave it the authority to provide long distance service to its customers:

"* * * Union has, since its organization in 1914, provided telephone service to the inhabitants of [Sweetwater and Uinta Counties]. * * * A connection for long distance telephone service is made at Mountain View with The Mountain States Telephone and Telegraph Company.

\* \* \* \* \* \* \*

"* * * [A] Certificate of Public Convenience and Necessity * * * is hereby issued to Union Telephone Company * * * authorizing it to construct, operate and maintain a modern dial telephone system for the purpose of furnishing dial exchange telephone service to [its customers] * * *."

Union, in its argument, interprets the language relating to the "dial exchange tele-

phone service" to encompass certificated authority to provide long distance service within Wyoming, and that authority would incorporate what is now intrastate inter-LATA service. Union urges the proposition that the fact that the PSC mentioned the connection with Mountain Bell manifests an implicit recognition that Union relied upon the Mountain Bell hookup to permit it to provide long distance service to its customers.

■ The PSC read the language of the 1957 certificate of public convenience and necessity differently. It concluded that the certificate recognizes only the authority of Union to provide local telephone service and that the language connotes that it was Mountain Bell that possessed the right to provide long distance service. In this regard, Union's contention is that no special deference should be afforded the conclusion of the PSC because the proper interpretation of Union's certificate of public convenience and necessity is purely a matter of law. *Cf. Mekss v. Wyoming Girls' School,* 813 P.2d 185 (Wyo.1991); *State ex rel. Workers' Compensation Division v. Brown,* 805 P.2d 830 (Wyo.1991); *Union Pacific Railroad Company v. Wyoming State Board of Equalization,* 802 P.2d 856 (Wyo.1990); *Employment Security Commission of Wyoming v. Western Gas Processors, Ltd.,* 786 P.2d 866 (Wyo.1990) (Supreme Court owes deference to agency findings of fact but may correct erroneous agency conclusions of law). It is correct that this court does not generally afford deference to an administrative agency's determinations with respect to questions of law, but there also is no question that we do give to the PSC wide latitude and discretion with respect to its interpretation of the certificates of public convenience and necessity that it issues. *See Svilar Light and Power, Inc. v. Riverton Valley Electric Association, Inc.,* 355 P.2d 52 (Wyo. 1960). For a similar rule that exists in our neighboring state of Colorado, *see also, e.g., Public Service Co. v. Public Utilities Commission of the State of Colorado,* 653 P.2d 1117 (Colo.1982); *McKenna v. Nigro,* 150 Colo. 335, 372 P.2d 744 (1962).

■ The rule that accords latitude and discretion to the PSC with respect to the interpretation of its certificates of public convenience and necessity exists because that certification function is a discretionary one by necessity. That discretion has to include interpretation of the authority that is granted once the certificate is issued. We are satisfied that the PSC, which issued this certificate, is in the best position to properly interpret it. Absent an interpretation that is arbitrary, capricious, or not in accordance with law, we defer to the interpretation of the certificate of public convenience and necessity that was made by the PSC.

■ The review we have made of the record and of the PSC's order in this case persuades us that the interpretation of Union's certificate of public convenience and necessity by the PSC was not arbitrary or capricious, and was in accordance with law. The PSC explained in its order that it consistently has viewed Union, and consistently has referred to Union in access tariff approval, as an "independent investor-owned local exchange utility" authorized to provide "Wyoming intrastate local exchange services within its authorized service area." The PSC further noted that Union possesses no facilities outside of its certificated serving area for the purpose of originating and completing intrastate inter-LATA calls. The interpretation of this certificate by the PSC is adequately supported, and it is affirmed.

Union's next argument is that, in that period of time prior to divestiture, Mountain Bell acquiesced in the providing of intrastate interLATA service by Union. Union contends that AT & T, pursuant to its certificate of public convenience and necessity relating to intrastate interLATA service, inherited only Mountain Bell's prior right to provide the service, and Union contends that AT & T must be bound by the acquiescence of Mountain Bell. The terms of the agreement between Union and Mountain Bell are encompassed within the Toll Settlement Agreement that Mountain Bell and Union reached prior to the divestiture. It is Union's claim that this agree-

ment permitted Union to deal directly with its customers for the purpose of billing and receiving revenues for long distance service.

More specifically, Union's argument is that those intrastate interLATA customers within Union's territory were Union's customers since the toll settlement agreement provides that "Union would bill and collect charges from its originating customer and compensate Mountain Bell or other companies for their service." The agreement actually provides that Union would remit *all* of the intrastate and interstate toll revenues to Mountain Bell and that Union would be compensated by Mountain Bell for Union's cost in providing the service and for a reasonable return on Union's company plant investment. According to the agreement, the balance of the funds generated by intrastate and interstate long distance service was allotted to Mountain Bell. Although there were other provisions of the agreement that could support Union's interpretation, the overall tenor of that agreement concerning long distance telephone service demonstrates that Mountain Bell was the actual service provider, and that it merely compensated Union for the use of Union facilities.

■ Even if the agreement Union relies upon does offer support for Union's position, it is clear that a contractual arrangement between Union and Mountain Bell, unless it is incorporated in the certificate of public convenience and necessity by the PSC, has no validity with respect to any modification of the authority found in the respective certificates of public convenience and necessity. Neither could it be recognized as stripping the PSC of jurisdiction over the territorial disputes. *See Tri-County Electric Association, Inc. v. City of Gillette,* 584 P.2d 995 (Wyo.1978). Once

the dispute over authority was submitted to the PSC, the PSC had the authority under our law to determine the certificated rights of each of the parties, and it could do that without regard to the nature of Mountain Bell's pre-divestiture agreement with Union. Section 37–2–112, W.S.1977 (Dec. 1977 Repl.). In the proceeding before the PSC, the certificated authority of each of the utilities involved would control over an arrangement between them. It follows that whatever Union's agreement was as set forth in the toll settlement agreement, Union's contention that the agreement made it the proper carrier for intrastate interLATA calls properly was rejected by the PSC.

Union follows with an argument that, since the MFJ did not purport to affect the rights of the Independent Telephone Companies, Union must be regarded as having retained its "pre-divestiture right to provide intrastate, interLATA service" after the effective date of the divestiture. We have accepted the finding of the PSC, however, that Union had no such right prior to the effective date of the divestiture, and this argument must be rejected.[7]

■ Union's final argument with respect to its authority to provide intrastate interLATA service to its customers is that the public interest favors its provision of such service. Union presented evidence in the hearing before the PSC that demonstrated its substantial investment in long distance facilities would be jeopardized by the decision of the PSC, and its evidence also tended to show that its facilities in many instances are superior to those of AT & T. The public interest is a primary factor to be considered by the PSC in its adjudicative role. *McCulloch,* 627 P.2d 173; *Rule Radiophone,* 621 P.2d 241; § 37–2–205(c), W.S.1977 (Cum.Supp.1990). It is the agen-

---

7. The language in question reads as follows: "The decree does not impose any obligations or restrictions on the ITCs [Independent Telephone Companies], either directly or by way of configuration of LATAs." *United States v. Western Electric Company, Inc.,* 569 F.Supp. 990, 1008 (D.D.C.1983).

"The LATAs will not include any ITC areas. This is consistent with the decree which re-

quires only that all points served by the Bell Operating Companies be included in a LATA. Section IV(G)(2). The LATAs were drawn without reference to the ITC areas to ensure that the decree could not be construed as imposing any obligations or restrictions on the ITCs themselves." *United States v. Western Electric Company, Inc.,* 569 F.Supp. 990, 1008 n. 85 (D.D.C.1983).

cy's prerogative, however to weigh the value and effect to be given particular evidence relating to the public interest. In the absence of evidence that the agency acted arbitrarily or capriciously in deciding what the public interest is in the particular situation and what weight that interest should be afforded in the decision-making process, we defer to the judgment of the agency. We have found no evidence of arbitrary or capricious action in this case. This is particularly true in view of the ruling that Union had no right to operate beyond the scope of its certificated authority, and the PSC had the duty to consider the interests of the public at large.

In summation, it is our holding that the PSC did not act arbitrarily, capriciously, or contrary to law in adopting its ruling that Union had no authority to provide intrastate interLATA service to its customers. We also hold that the findings by the PSC on this issue are supported by substantial evidence.

In the next issue set forth by Union, which is very much like the other side of the coin with respect to the first issue, Union contends that AT & T had no authority to provide intrastate interLATA service to Union's customers. The argument advanced by Union is that, because the certificate of authority given to AT & T for intrastate interLATA service is the same as the authority previously held by Mountain Bell and, since Mountain Bell never acted as a retail provider for Union's long distance service, AT & T is without a certificate of public convenience and necessity to provide intrastate interLATA service to Union's customers.

In analyzing this argument, we first consider the scope of authority held by Mountain Bell to provide intrastate toll service prior to the effective date of divestiture. The order of the PSC entered in 1984 that granted AT & T permanent authority to provide intrastate interLATA service recognized such authority existing in Mountain Bell. In its order, the PSC stated:

> "Mountain Bell is a Colorado Corporation authorized to transact business in Wyoming, with its main office in Denver. * * * Mountain Bell is authorized by this Commission to provide all telecommunications services in the areas certificated to it *and intrastate toll service throughout Wyoming* by Commission orders in Docket No. 9382 and subs thereunder and by the Wyoming Supreme Court decision in *Dubois Telephone Exchange v. Mountain States Tel. and Tel.*, (Wyo. 1967) 429 P.2d 812, wherein the Court affirmed Mountain Bell's right to provide exclusive statewide message toll services." (Emphasis added.)

This certificate recognizes authority in Mountain Bell to provide statewide, intrastate toll services prior to the divestiture.[8]

---

**8.** In its argument, Union challenges the premise for Mountain Bell's statewide authority pursuant to the 1984 certificate. Union contends, and we are disposed to agree, that *Dubois Tel. Exchange v. Mountain States Tel. and Tel. Co.*, 429 P.2d 812 (Wyo.1967), did not "affirm Mountain Bell's authority to provide exclusive statewide message toll services." Furthermore, we recognize that Docket Number 9382, referred to in the order of the PSC, was a certificate of public convenience and necessity granted to Mountain Bell on August 5, 1960, which extended to Mountain Bell authority to provide intrastate toll service *within its service area.* The authorities cited by the PSC in its 1984 order do not, in and of themselves, demonstrate a statewide grant of authority to Mountain Bell to provide long distance toll service.

We do not, however, perceive that it would be appropriate to interfere with the use of the PSC of its earlier statement concerning Mountain Bell's authority. We are reluctant, because of a procedural rule, to inquire into the 1984 determination by the PSC concerning Mountain Bell's authority. Union, which was a participant in the 1984 certification proceeding, has not shown that it endeavored to obtain judicial review of the 1984 determination by the PSC. The failure to challenge that certificated authority in the original proceeding can lead to a procedural bar in a later dispute before the PSC. Cf. *Riverton Valley Electric Ass'n v. Pacific Power and Light Co.*, 391 P.2d 489 (Wyo.1964) (certificate issued by PSC which did not reflect parties' stipulation should have been challenged at time of issuance). In addition, there are practical difficulties with making any such inquiry since we do not have before us either briefs or a record that would show whether there was substantial evidence to support the conclusion reached by the PSC in the 1984 proceeding. Consequently, we choose not to adopt Union's argument that the 1984 grant of authority to Mountain Bell pursuant to its certificate of public convenience and necessity was not supported by the authorities cited by the PSC.

Furthermore, as we already have discussed, Mountain Bell acted, at least in the economic sense, as the service provider for its toll settlement agreement with Union. In addition, there is to be taken into account the language in Union's own certificate of public convenience and necessity that states that a connection is made with Mountain Bell for the provision of long distance service.

■ Once the divestiture order became effective, and the PSC had issued the certificate of public convenience and necessity to AT & T, the intrastate interLATA component of what had formerly been Mountain Bell's long distance service was allotted to AT & T. AT & T clearly succeeded to Mountain Bell's authority to provide this particular service. On the basis of this record, we conclude that the PSC did not act arbitrarily or capriciously, did act in accordance with law, and did not abuse its discretion in ruling that the authority to provide intrastate interLATA telephone service to Union's customers was assigned to AT & T. To the contrary, the record rather clearly demonstrates that this was an historical succession of authority from Mountain Bell to AT & T and that Union had never had that authority pursuant to its certificate of public convenience and necessity.

■ We turn then to the last issue presented by Union relating to its concerns about the implementation provisions of the PSC's order. Union challenges the requirement by the PSC that Union's customers be billed at AT & T rates; the requirement that Union report interLATA revenues using a PARS; and the requirement that Union's access rates follow the AT & T methodology. It is necessary to analyze each of these claims separately. In doing so, we acknowledge the principle that, when a conflict exists between two utilities, the PSC is authorized to make such order and prescribe such conditions as seem just and reasonable. *See Tri–City Electric Association v. City of Gillette*, 584 P.2d 995 (Wyo.1978).

Union first asserts that the PSC requirement that Union must bill and collect long distance and operator charges at AT & T's tariffed intrastate rates will result in a rate increase to Union's customers. For that reason, Union argues that the PSC should have, but did not, follow the statutory procedures and make the appropriate findings for a rate increase. Section 37–2–120, W.S.1977 (Dec. 1977 Repl.), requires in the part pertinent to this issue:

" * * * No order, however, shall be made by the commission which requires the change of any rate or service, facility or service regulation except as otherwise specifically provided, unless or until a public hearing has been held in accordance with the provisions of this act."

We previously have ruled that this section contemplates a trial-type hearing, and we have reversed a PSC order which resulted in a rate increase but did not afford such a hearing. *Tri–State Generation & Transmission Association, Inc. v. Wyoming Public Service Commission*, 735 P.2d 718 (Wyo.1987), *appeal after remand*, 784 P.2d 627 (Wyo.1989). In this case, however, extensive public hearings were held on AT & T's complaint. Notice was given of these hearings. The requisite opportunity to cross-examine and to produce witnesses also was provided.

We hold that the PSC hearings on AT & T's complaint fulfilled the requirement of a public hearing "prior to any change of rate or service." Even if that were not so, we also must recognize that there truly was no rate increase so far as AT & T's rates were concerned, and we would hold that the hearing that Union says should have occurred is not required simply because the rates that have been filed by the utility holding the proper certificate of public convenience and necessity were greater than the rates charged by a utility that did not have the requisite certificate of public convenience and necessity.

■ Union then continues its argument by asserting that the PSC failed to make a finding that Union's rates were "inadequate or unremunerative, * * * unjust, or unreasonable, or unjustly discriminatory, or unduly preferential *or otherwise in any respect in violation of any provision*

*of this act"* before substituting AT & T's rates for Union's. Section 37-2-121, W.S.1977 (Dec. 1977 Repl.) (emphasis added). As we have noted above, the record demonstrates that the PSC did find a violation of the act prior to the substitution. The PSC clearly found that Union's unauthorized provision of intrastate interLATA service was a violation of the certificate of public convenience and necessity held by Union and a violation of § 37-2-205(a), W.S.1977 (Cum.Supp.1990). Since Union had no authority to provide the service, the PSC reasonably could have refused to implement Union's rates on the ground that they were simply part of a plan in direct violation of applicable law. The PSC did state that its implementation plan was designed to "return the parties to the *status quo* that existed before Union began providing direct-dialed and operator-handled toll services beyond the scope of its certificates of public convenience and necessity * * *." In its appeal, Union has not demonstrated that the PSC committed an error by requiring that Union bill at AT & T's tariffed rates, which were the only tariffed rates in effect for this particular service.

■ The next argument presented by Union involves its complaint that the PSC erred by requiring Union to submit a monthly PARS to AT & T. Union's contention is that this "forced transfer of Union accounts" will result in Union's having to disclose proprietary business information. Union insists that the PSC's failure to "net" the amounts due between Union and AT & T is erroneous; there is no evidence that other companies have entered into such PARS arrangements with AT & T or that the arrangement is in the public interest; and the PSC has ordered Union to transfer its business accounts without compensation. Similar arguments were made before, and rejected by, the PSC. On the basis of the record presented, we are unable to conclude that the decision by the PSC to require the use of a PARS as the device for accounting for the services rendered by AT & T was arbitrary and capricious, was not in accordance with law, or was not supported by substantial evidence.

Again, we identify a continuation of historical methodology.

First, the PSC found that Union already remits a PARS to AT & T for intrastate interLATA calls. Union has failed to articulate any good reason for distinguishing the intrastate PARS required under the PSC's order from the interstate PARS which it already voluntarily furnishes. In the second place, the PSC noted that Union had remitted a monthly PARS to AT & T for intrastate interLATA service prior to September, 1986. Because Union had no certificate of public convenience and necessity to provide intrastate interLATA services in Wyoming, Union's complaint that information regarding "its" intrastate interLATA customers would be disclosed to AT & T is nothing more than a redundant statement that it does not wish to relinquish intrastate interLATA service to AT & T as the PSC ordered. We have previously affirmed that portion of the order of the PSC that requires Union to desist from furnishing that service.

■ In its next argument, Union challenges the requirement invoked by the PSC that Union adopt the F.C.C. Parts 36–69 methodology in fixing its access rates for AT & T's Feature Group C access. F.C.C. Part 36 first divides a company's total cost between interstate and intrastate service. F.C.C. Part 69 then allocates the interstate costs between various categories. It is Union's argument that the access tariff created by this methodology results in rates that are too low to cover Union's overall operating costs because Union no longer will be permitted to set the access rates charged to AT & T in order to subsidize its own local and interLATA long distance service. Thus, Union will have to increase its local service rates by $5 per month to meet the shortfall, and AT & T service will be unfairly subsidized. In the course of the hearing, the PSC had before it testimony that Union's intrastate access rates had been set unreasonably high. A vice-president of AT & T testified at the hearings that Union's residual pricing scheme resulted in a perpetual subsidy to Union. The PSC also had before it testimony that, due

to practical considerations, a number of independent telephone companies in the mountain states have adopted Parts 36–69 methodology to set intrastate access rates. The PSC then found that the results of the F.C.C. methodology more closely approximated Union's costs of providing access services than would the approach utilized by the ORP.

■ This court, in a different utility context, has recognized that discretion is vested in the PSC in establishing rate-making methodology so long as the result reached is reasonable. *Mountain Fuel Supply Co. v. Public Service Commission of Wyoming*, 662 P.2d 878 (Wyo.1983). In this particular case, the PSC adjusted Union's rates to correspond more closely with the actual costs involved. Under the circumstances reflected in this record, we are unable to say that there was any abuse of discretion granted to the PSC to set reasonable rates by virtue of its order requiring Union to adopt F.C.C. Parts 36–69 methodology. *See* Sections 37–2–112, –2–121, –2–122, –2–127, W.S.1977 (Dec. 1977 Repl.).

In this instance, Union has been unable to demonstrate that challenged portions of the PSC orders are arbitrary, capricious, not in accordance with law, or not supported by substantial evidence. Our examination of the record persuades us that the order of the PSC is a lawful exercise of its regulatory powers. The decisions of the PSC are affirmed in all respects.

APPENDIX 1

URBIGKIT, Chief Justice, dissenting.

I join in the dissent of Justice Macy. As recognized in majority opinion, it appears that all parties agree that the basic issue presented for appeal is whether the Public Service Commission order granted AT & T expanded authority for services previously provided by Mountain Bell with a concurrent requirement for Union Telephone to contract its historical conduct of business enjoyed prior to 1984 when the AT & T

divestiture occurred, or whether the status quo of the pre–1984 business relationships of Union Telephone and Mountain Bell would be now maintained between AT & T and Union Telephone. It was the divestiture which put AT & T into the prior position occupied by Mountain Bell.

When the syllogism is stated in that fashion, all litigative participants and the majority seem to agree that the Public Service Commission order presently restricting activities of Union Telephone and commensurately expanding the rights of AT & T *is directed to restore the status quo which existed prior to 1984.*

With this syllogism properly stated for the issue to be appropriately defined, I observe the arguments to be academically expansive, but find that the factual assertion and conclusion by the Public Service Commission, as now restated in the majority, to be factually in error. Discussion about the "scope" of authorization of the pre–1984 certificates of convenience and necessity issued either to Mountain Bell or to Union Telephone seems to be either inconclusive in dispute or arcane in application. The real issue addressed to the real world is whether the actual conduct existent pre–1984 is maintained or now to be altered to result in harm to Union Telephone and benefit to AT & T within this area of out-of-certificated territory telephone service.

Volume I of the agency record starts with a hearing notice by the Public Service Commission dated in early 1988. The agency record in fourteen extensive volumes continues for more than a year. Judicial involvement, pursued through three more volumes of this record, started in November 1989. After an extended session conducted by the trial court on May 8, 1990, the case was certified to this court on July 9, 1990.

It would seem that a record developed and argument pursued for that period of time could have dispositively resolved one simple question as a determinable fact: Does the present Public Service Commission order reduce authorized activities of Union Telephone compared to their conduct of business before 1984 and commensurately expand AT & T into activities Mountain Bell did not conduct before 1984—*intrastate interLATA?*

Although somewhat concealed in the totality of the pages of this accumulated record, I find the answer disarmingly apparent. Before 1984, Union Telephone was the retail provider to conduct this character of telephone service, but the present decision *factually* transfers that status to AT & T. The pre–1984 status is not maintained, the asserted goal is missed or ignored, and this decision is consequently wrong.[1] I join in the dissent of Justice Macy.

MACY, Justice, dissenting, with whom URBIGKIT, Chief Justice, joins.

I am painfully aware we have given wide latitude and discretion to the PSC with respect to its interpretation of the certificates of public convenience and necessity which it issues. This does not mean, however, that we must "rubber stamp" the PSC's interpretations when such interpretations do not require the PSC's expertise and experience. We have repeatedly stated that whether or not a writing is ambiguous is a question of law to be decided by this Court. It is crystal clear to me that the words,

> [A] Certificate of Public Convenience and Necessity ... is hereby [ ] issued to Union Telephone Company ... authorizing it to construct, operate and maintain a modern dial telephone system for the purpose of furnishing dial exchange telephone service to [its customers,]

give Union unchallengeable authority to provide intrastate interLATA service to its customers. This is especially clear when

---

1. It is much more difficult to sift out of the briefing, argument and record exactly what operational changes resulted from the transference of retail provider from Union Telephone to AT & T. What it does include is service of operators, billing, revenue stream, primary con- tact status, telephone dialing numbers and signs on telephone booths. Amazingly, all of this really started from the status of one pay telephone at one newly constructed truck stop located within the certificated territory of Union Telephone.

such certificate is preceded by the statement:

> Union has, since its organization in 1914, provided telephone service to the inhabitants of [Sweetwater and Uinta Counties].... A connection for long distance telephone service is made at Mountain View with The Mountain States Telephone and Telegraph Company.

There is nothing in the certificate which would in any way put one on notice that intrastate interLATA service would not be included within Union's certificate of public convenience and necessity.

It appears that, if the PSC intended to except intrastate interLATA service from Union's certificate, it could have easily said so.

I agree with the majority and the PSC that AT & T's authority to provide intrastate interLATA service is limited to that authority held by Mountain Bell prior to the effective date of the divestiture. I cannot, however, find any predivestiture certificated authority permitting Mountain Bell to provide long distance service to Union's customers.

I am concerned that this Court has given too much latitude and discretion to the PSC to apply strained interpretations to the language contained in Union's and Mountain Bell's certificates of public convenience and necessity under the guise of a standard of review which has no application when the meaning is clear. It is quite obvious the PSC failed to use its alleged expertise in interpreting the certificates in question in this instance. The certificates simply do not say what the PSC says they say!

It is the duty of this Court to use its expertise and experience to determine questions of law, and we should not abrogate that duty. The PSC's order is unlawful and should be reversed.